ISSA BALL et al., Appellants, v. ORINDA I. BALL et al.

Division Two, November 26, 1901.

1. **Widow's Homestead: WILL.** Unless the intention to exclude the widow's right to homestead and dower, which are invested in her by operation of law, is manifest from the provisions of the will, she will not be deprived thereof, but may claim both the benefits given her by the law and the will. The intent of the testator to exclude her from homestead and dower should appear in the will; and unless she is by the testator given more property than that to which she would, without the will, have been entitled by operation of law, it will be held, in the absence of provisions in the will excluding her from these statutory rights, that it was not the testator's intention to deprive her of them.

2. ——: **ELECTION.** The principle of election rests upon the equitable ground that no man can be permitted to claim inconsistent rights with regard to the same subject.

Ball v. Ball.

3. ——: PROVISIONS OF THE WILL: HOMESTEAD: DOWER. The will put all testator's property in the widow, for her support and the education and maintenance of his children during minority, and as they arrived at age she and his brother were to set off to each child "a reasonable portion" of the estate "so that the children shall be made equal" and so that "my wife shall have such portion as she will now be entitled to under the statute of descent and distribution." The testator died in 1874, and at that time a homestead to the value of fifteen hundred dollars vested absolutely in the widow at the majority of the children, and under the statutes of descents and distributions then in force, the lands descended to the children subject to the widow's dower. The widow continued to occupy the homestead, which consisted of 160 acres and was worth more than $1,500, and after the children became of age she and her brother-in-law set off to them two or three hundred acres of detached lands, and they exchanged deeds with each other therefor. *Held, first,* that until dower was assigned, the widow was entitled to remain in and enjoy the mansion house and the messuages or plantation thereto belonging without being liable to pay any rent therefor; *second,* the widow received nothing more under the will than she was entitled to receive by law had she not accepted its provisions, and, hence, was not deprived of her dower or homestead; *third,* after dower was assigned, she was entitled, by operation of law, to homestead in the mansion house and messuages to the value of $1,500; *fourth,* by a valid and binding agreement between her and testator's children the entire mansion house and plantation could have been set off to her as her homestead regardless of its value, whether in excess of $1,500 or otherwise; *fifth,* a conveyance by her to some of the children of a part of the homestead, whose value was in excess of $1,500, and which had not been enlarged by valid agreement between her and the heirs, and by such children to other children, did not affect the rights of the other children who had no part in such conveyance, since these grantees were not innocent purchasers; *sixth,* as the widow never relinquished her dower in her husband's lands, she is entitled thereto unless her interest in the homestead equals or exceeds a lifetime one-third interest therein, in which case she is not entitled to dower in addition to homstead.

Appeal from Morgan Circuit Court.—*Hon. Dorsey W. Shackleford,* Judge.

REVERSED AND REMANDED.

*Ross & Bohling* for appellants.

(1) The will of Addison T. Ball gave his widow Orinda I. Ball, "such portion as she would be entitled to under the statute of descent and distribution now (then) in force in this State." She took under the will. She pleads the will in her answer, and claims to hold under and by virtue of its provisions. Davidson v. Davis, 86 Mo. 440. (2) The widow, having taken under the will, can not take also under the homestead law. (a) The homestead law in force in 1874, not exempting the rights of the widow from the operation of the will of her husband, she will be excluded from homestead by accepting the provisions of the will made for her in lieu thereof. She accepted the provisions made for her by the will. She says so in her answer. A party is bound by the statements made in his pleadings. Knoop v. Kelsay, 102 Mo. 291. Schorr v. Etling, 124 Mo. 47; Burgess v. Bowles, 99 Mo. 550; Davidson v. Davis, supra; Estate of Meech, 37 Vt. 419. (b) "It is a maxim of a court of equity not to permit the same person to hold under and against a will." Pemberton v. Pemberton, 29 Mo. 413; Schorr v. Etling, supra; Van Syckel v. Beam, 110 Mo. 592. (3) Dower was never admeasured and set off to the widow. She was and is entitled to be endowed of one-third in value of all lands of which her husband died seized, including the mansion house. The mansion house is on the 160 acres in question. Said 160 acre-tract is substantially one-third in quantity of all of said lands, and much more than one-third in value. The evidence is that said tract is worth as much as all the remainder of the lands of decedent. R. S. 1899, sec. 2933. (4) She had the right to transfer and assign her unassigned dower interest, and her grantee succeeds to the right to sue for and have the same assigned to him; but her assignee, William L. Ball, took subject to all the liabilities that attach to such estates in the hands of the dowress.

R. S. 1899, sec. 2934.    Where the widow elects to take under
the will, those claiming under her are bound by her election.
Van Syckel v. Beam, 110 Mo. 589.    William L. and Emmett
Ball do not stand in the position of innocent purchasers.
"When one can not make out his title except through a deed
or other instrument which leads him to the knowledge of
another fact, he will be deemed to have knowledge of that fact."
Loring v. Groomer, 110 Mo. 632. (5) The evidence being that
the 160 acres held and conveyed by the widow was equal in
value to all the balance of the land of which the testator died
seized, her dower can not include all of said 160 acre tract.
Appellants in the first count of their petition pray the court
to have the dower of the widow admeasured.    The court erred
in refusing so to do.

*Wm. Forman* and *D. E. Wray* for respondents.

(1)    There is no inconsistency in the widow, Orinda I.
Ball, taking the devise under the will and the homestead under
the law, and she was not required to elect.   Schorr v. Etling,
124 Mo. 42.    (2)    "The homestead as dower is vested in the
widow by operation of law and without the act or will of the
husband, and in spite of them.    It follows that, unless the in-
tention to exclude these rights is manifest from the provisions
of the will, they will not be excluded.    She can claim both the
benefits given her by law and the will.    The intent of the tes-
tator to dispose of that which is not his should appear upon the
will."    Schorr v. Etling, supra.    The widow was not required
under the terms of the will to elect.    It was evidently the in-
tention of the testator to give to her all she was entitled to under
the law then in force.    (3)    The failure of the widow to re-
nounce the will did not deprive her of her homestead.    Schorr
v. Etling, supra ; Bogart v. Bogart, 138 Mo. 419.    (4)    The
heirs are bound by the parol partition of the lands.    Appel-
lants acknowledged this when they made warranty deeds to

William L. Ball, Dollie Ball and Emmett Ball, to the respective tracts set apart to them, and when they accepted deeds from respondents to the lands conveyed to appellants in pursuance of the parol partition.

BURGESS, J.—Addison T. Ball died testate in February, 1874, leaving his widow, Orinda I. Ball, and his children, his only heirs at law, Issa and Minnie Ball, plaintiffs, and Dollie, Emmett and William L. Ball, defendants surviving him. His will was as follows:

"First. My will is that my wife have the entire control and management of my estate both real and personal for the uses and purposes hereinafter mentioned so long as she remain my widow.

"1st. For the payment of all my just debts and 2d for the necessary and proper support of herself and necessary and proper support and education of my children during their minority, and for this purpose I desire that my wife and children keep and use my property in common without any division until the children shall respectively arrive at age at which time I desire my wife with the advice and assistance of my brothers John and Jamison Ball to set off to each child a reasonable portion of my estate and so on as each child becomes of age until the last one attains its majority, at which time I desire all my estate divided so that my children shall be made equal and my wife have such portion as she would now be entitled to under the statute of descent and distribution now in force in this State.

"Second. In case of the marriage of my wife my will is that my brothers John and Jamison Ball or in case of the death of either the survivor then take charge of my estate and cause it to be distributed of among my wife and children according to the statute of descent and distribution now in force in this State.

"Third. I hereby appoint my wife and brother above named executors of this will.

"In witness whereof, I have hereunto set my hand this twelfth day of February, 1874.

"A. T. BALL."

The purposes of this suit is to have the will construed; to admeasure and set off dower to his widow, Orinda I. Ball, defendant herein; to determine, adjudge and decree to plaintiffs their estate in the lands in controversy; and to annul the deed of Orinda I. Ball to William L. Ball, and the deed of William L. Ball to Emmett R. Ball, in so far as said deeds affect or cloud the title of plaintiffs in and to said lands.

The widow took and held under the will and proceeded to carry out its terms and provisions. Addison T. Ball died seized of 485.95 acres of land in different disconnected tracts in Morgan county, Missouri.

On the eighteenth day of March, 1893, all the children having reached their legal majority except William L., the widow, with the assistance of John Ball (Jamison Ball having died), proceeded to set off to said children portions of said lands. This was done by the devisees exchanging or making deeds to each other. No conveyance was made of the 160 acres on which the mansion house was located; nor was any action taken in any court or in any manner whatever setting apart said lands to the widow.

In 1896, and subsequent thereto, the defendant, Orinda I. Ball, asserted claim of absolute title to said 160 acres of land, the same being described as follows, to-wit. The southeast quarter of the northeast quarter; 60 acres the south part of the west half of the northeast quarter; and 60 acres the south part of the east half of the northwest quarter all in section 24, township 43, of range 18, in Morgan county, Missouri.

On the fifth day of February, 1897, she conveyed said lands by warranty deed to her son and co-defendant, William L. Ball; and thereafter on the second day of February, 1898, William conveyed by warranty deed to his co-defendant, Em-

mett R. Ball, 40 acres of said land described as follows: The south half of the northeast quarter of the northwest quarter and the south half of the northwest quarter of the northeast quarter of section 24, 43, 18. Said defendants then and thereafter openly asserted title absolutely to said lands and denied the right of these plaintiffs to have or to hold any right, title, interest or estate, either present or in expectancy, in and to said 160 acres of land.

By the separate answer of Orinda I. Ball she pleads the will, and claims under it, and also claims the fee simple title to the one hundred and sixty acres, under the homestead law then in force (vol. 1, sec. 5, p. 628, Wagner's Statutes, 1872). The answer of the other defendants makes the same allegations and claim of homestead.

Evidence offered by plaintiffs tended to show that the land was worth from $15 to $22.50 per acre at the time of the trial, and that at the time of the death of the testator the one hundred and sixty acres exceeded in value fifteen hundred dollars, and was equal in value to all of the remainder of his land.

With respect to the division of the land, the evidence was as follows:

Issa Ball, plaintiff, testified as follows:

"Q. When did you first learn that deeds were to be exchanged as to the other parts of this land? A. About an hour before the deeds were made out she (my mother) came up to tell us to come to town and sign those deeds.

"Q. Did you and your sister come to town? A. Yes, sir; we went to McNair's office.

"Q. What happened there. A. We signed the deeds there. The first I knew about the making of the deeds was about an hour before they were made. She (my mother) said for us to come to town and sign those deeds. Had heard nothing before about it. We were living about a mile and a quarter from my mother's at the time, at Mr. Taylor Blank's.

Had been there about two weeks.     Had not been at my mother's house for two weeks.     The trouble occurred before we left home.     It was not with reference to the land nor to the estate.     We had not discussed, or attempted to make, a division of the land before we left.

"Q.     When did you learn for the first time what piece of land you were to have in the division?     A.     Not until I came to sign the deeds.

"Q.     Who told you then?     A.     McNair.

"Q.     What did he say to you, what information did he give you?     A.     Well he stated that they wanted to divide the land and that we would get 70 acres apiece, 60 acres apiece. on the Moreau and 10 acres apiece off of the old homestead place.

"Q.     Well, when he made that statement to you didn't he state to you that that was your part of your father's estate? A.     Yes, sir.

"Q.     Did he state what each one of the others got?     A. No, sir.

"Q.     Did you make deeds at that time to Will, Emmett and Minnie?     A.     Yes, sir.

"Q.     I will ask you if this 160 acres had been used by your mother all the time and cultivated as the home place from the time you can first recollect?     A.     Yes, sir."

Minnie Ball testified as follows:

"I remember when certain deeds were made and executed in McNair's office.

"Q.     Who spoke first to you about the making of those deeds?     A.     My mother came to Mr. Blank's and asked me to come and sign them.     She said for us to come to town and sign those deeds if we wanted our part of the estate.     We came to McNair's office.

"Q.     State whether or not at the time you made any agreement in regard to the 160 acres of land upon which your mother lived?     A.     No, sir, we did not."

On cross-examination she said:

"Q. Did you have a lawyer at that time? A. No, sir.

"Q. Wasn't Mr. Spurlock present at the time? A. Yes, he was present while we signed the deeds. We asked him to. We asked his advice.

"Q. Your mother told you that was to be the part of your father's estate? A. No, sir.

"Q. Didn't you so state awhile ago? A. Not after we came into the courtroom. It was at the house.

"Q. After you signed deeds for the others, they signed and gave you deeds, didn't they? A. Yes, sir.

"Witness continuing: We took possession of the land deeded to us and have been in possession ever since and collected the rents."

Emmett Ball testified as follows:

"I am a defendant in this case. I was present when the deeds were made between the different heirs of this estate.

"Q. State what the agreement was or understanding at the time these deeds were made? A. The understanding was when the land was all divided up among us heirs, except the 160, that the 160 was to go to the old lady for herself, to do as she pleased with.

"Q. They agreed to it? A. Yes, sir, and they signed deeds as I did. I conveyed to them, they conveyed to me."

On cross-examination he testified:

"Q. Where did the agreement take place? A. In McNair's office was one place, and we agreed to it at home before we came to town.

"Q. At your mother's? A. Yes, sir.

"Q. Who was present? A. The two sisters and brother and my mother, about a week before we came to town.

"Q. What was said; you say it was an agreement? A. Well, I don't know as I can tell you exactly, but when they wanted to divide the land they agreed to take their part. They knew where their part was coming from. Every fellow knew

where he was getting it, and they all agreed to take as their part. I was one of them.

"Q. Well, what was said? A. That was what was said; we agreed to take a certain piece of land for our part.

"Q. Was there anything said about that 160 acres? A. Yes, sir; that was to belong to my mother.

"Q. Who said anything about that 160 acres? A. The rest of. the heirs, Issa, Minnie and Will.

"Q. What did Issa and Minnie say? A. They wanted to know what 160 acres it was.

"Q. What did they say? A. That is just what they said.

"Q. What was it? A. I told you once.

"Q. Is that all they said? A. That is all I can think .of.

"Q. And you call that an agreement do you? A. What else would you call it?

"Q. Was there anything said when you went to Mc-Nair's office? A. Yes, sir.

"Q. What was it? A. They wanted to know who was going to get that.

"Q. You mean Issa and Minnie? A. Yes, sir; and Will asked and I told like we agreed at home.

"Q. Did they do anything else besides ask who was going to get that? A. They signed the deeds.

"Q. Did they do anything else towards an agreement except to ask who was going to get that 160 acres of land? A. Yes, sir; they said if the old lady was going to get it, it was all right.

"Q. Who answered their question when they asked who was going to get the 160 acres? A. Mr. McNair.

"Q. Was Mr. McNair dividing the land for you? A. He was drawing up the deeds.

"Q. Who was Mr. McNair representing or acting for? A. For the whole outfit.

Vol 165 mo—21

"Q. Didn't the girls have an attorney there, Mr. Spurlock? A. I believe he did come in, too, just before they signed the deed."

William L. Ball testified as follows:

"I am one of the defendants in this case. Forty acres of the one hundred and sixty in question is mighty rough. There is timber on it and a railroad runs through it and two county roads. A division was made between the heirs in March, 1893.

"Q. That included the plaintiffs in this case, did it? A. Yes, sir.

"Q. Did the land divided at that time, to which you made deeds, include the 160 acres in controversy. When you divided the lands there, did you take it into consideration in determining the shares of the respective parties? A. Yes, sir.

"Q. State what the agreement or understanding was as to that 160 acres at the time that distribution was made? A. My understanding was the 160 acres was set over for my mother or her homestead.

"Q. State whether or not all the heirs recognized that as being her 160 acres, since you can remember? A. Yes, sir.

"Q. How old are you now? A. Twenty-six.

"Witness continuing: I bought this 160 acres from my mother since this division was made."

On cross-examination he said:

"The northeast corner of this 160 acre tract touches the railroad. It goes across the railroad. There is a little corner over there. I don't know how much there is in it.

"Q. You say that when the deeds were exchanged between the heirs to their portions of the land, that it was the understanding that the 160 acres should be held by your mother? A. I said so.

"Where did you get that understanding? A. I got it when I made the deeds.

"Q. Who did you get it from? A. From McNair.

Ball v. Ball.

"Q. Did Mr. McNair have authority to divide your father's estate? A. He didn't divide it.

"Q. Then you got your understanding from McNair? A. Yes, sir; that she could hold. Mr. Richardson passed on the same thing.

"Q. Then you speak of a legal point as to whether she could hold it? A. Yes, sir.

"Q. Then there was no agreement among the heirs as to that matter? A. No, sir; there was no deed made to her.

"Q. There was no agreement made between the heirs? A. No, sir; it was an understanding that she was to hold that as her homestead.

"Q. Whose understanding? A. All the heirs.

"Q. When did they make that agreement? A. When the deeds were made.

"Q. Where? A. Made down here; Jim McNair wrote the deeds.

"Q. Who was present? A. My brother was present and my sisters, and I believe Kavanaugh was in there.

"Q. Was your mother present? A. No, sir; she wasn't in the courtroom at all. I bought this land relying on the agreement made by all at the time that my mother should hold this as her homestead. I sold 40 acres of this land to my brother, E. R. Ball. He is a defendant."

Orinda I. Ball testified as follows:

"Q. State what was done in carrying out the terms of that will? A. We just divided that land.

"The Court: Who do you mean by we? A. Mr. John Ball and myself. Jamison Ball was dead at the time. John Ball was my brother-in-law. We set off to each of the children parts they were entitled to under the will.

"Q. State what was done with reference to your interest in that estate? What was done about setting up your interest in that estate? A. The 160 acres was left for my individual use to do as I pleased with, and I sold it. I have

been living on that 160 acres ever since his death. Have claimed that as my homestead. The market value of land in that community at the time of my husband's death was not very much. Don't know as I could state just exactly what."

On cross-examination she said:

"Q. Mrs. Ball, you say, speaking of the 160 acres, 'It was left to me as my homestead?' A. Yes, sir.

"Q. Who left it to you? A. My husband.

"Q. Then John Ball didn't have anything to do with it? A. He had nothing to do with that 160 acres, only the will said that portion was mine. Then the other portion was to be divided as me and him saw fit. Divided as equally as we could, and we did so.

"Q. You and he didn't do anything with that 160 acres you lived on and was sold? A. It was left to me.

"Q. The will left it for you? A. Yes, sir.

"Q. That is the way you understood the will?' A. Yes, sir.

"Q. You never divided any land except the other land, and you divided it between the children? A. We divided that between the children and left this for my home.

"Q. There was no paper fixed up and filed in any public office setting over that 160 acres to you as a homestead or a dower was there? A. There was if the officer done his duty.

"Q. Oh well, was there ever such a paper made? A. Yes, sir.

"Q. Who made it? A. I don't know who made it. I went according to the will.

"Q. You hold that 160 acres because that is the way you understood the will? Is that it?

"The Court: Are Issa and Minnie Ball your daughters? A. Yes, sir.

"Q. How old is Issa Ball? A. They will be twenty-eight the thirtieth day of next November.

"Q. They are twins? A. Yes, sir.

"Q.  When was this division of land made?

"Mr. Ross:  The pleadings show it was in '93.

"The Court:  Now at the time these lands were divided was it talked over between you and these children. A. Yes, sir.

"Q.  Talked over in the presence of Issa and Minnie Ball?  A.  Yes, sir.

"Q.  Did they understand that you were claiming that homestead?  A.  Yes, sir; all my children understood it from the word go.

"Q.  Were deeds made and delivered to them.  A. Yes, sir.

"Q.  At the time the deeds were delivered to them, did they know that you claimed the 160 acres as your homestead? A.  Yes, sir.

"Mr. Ross:  Mrs. Ball, you say you sold this land?  A. Yes, sir.

"Q.  To whom?  A.  William Ball."

The court found the issues for defendants and rendered judgment accordingly.

Plaintiffs appeal.

Plaintiffs contend that as Orinda I. Ball claimed under the will of her husband and in accordance therewith "such portion as she would be entitled to under the statute of descent and distribution now in force in this State," she could not also take under the homestead law then in force.  The first section of the statute of descents and distribution then in force (1 Wagner's Statutes, 1872, sec. 1, p. 529), provides that "when any person having title to any real estate or inheritance . . . . shall die intestate as to such estate, it shall descend and be distributed in parcenary to his kindred, male and female, subject to the payment of his debts and the widow's dower, in the following course:  First, to his children or their descendants, in equal parts," etc.  Under the homestead law then in force (sec. 5, p. 698, Wagner's Statutes 1872), upon the death of a housekeeper or head of a family leaving a widow or any

minor children, his homestead to the value of fifteen hundred dollars, passed to and vested in such widow or children, or if there were both, to such widow and children, without being subject to the payment of the debts of the deceased, unless legally charged therewith in his lifetime; and such widow and children, respectively, took the same estate therein of which the deceased died seized, the interest of the children ceasing upon their arrival at their majority, when the entire estate vested in the widow absolutely.

It was held in Schorr v. Etling, 124 Mo. 42, as the homestead law of 1865 (sec. 5, p. 698, Wagner's Statutes, 1872) did not exempt the rights of the widow from the operation of the will of the husband, she can be excluded from her homestead by devises made by him, provided she accepts the provsions made for her in lieu thereof. And that the doctrine of election should be applied in determining whether she shall have her homestead by right under the statute or the benefit of the will. [Burgess v. Bowles, 99 Mo. 550; Davidson v. Davis, 86 Mo. 442; Meech v. Estate of Meech, 37 Vt. 419.]

In course of the opinion in Schorr's case it is said: "It is said in the case last cited, in construing the statute which was adopted under our Act of 1865, that the dower and homestead laws are so much alike, and being for the same general objects, 'that no distinction can be made as to the rules applicable to them when the question of election between them and a will arises.'"

The homestead, as dower, is vested in the widow, by operation of law and without the act or will of the husband, and in spite of them. It follows that, unless the intention to exclude these rights is manifest from the provisions of the will, they will not be excluded; she can claim both the benefits given her by the law and the will. The intent of the testator to dispose of that which is not his should appear upon the will. [Stratton v. Best, 1 Ves. Jr. 285; Gibson v. Gibson, 1 Drew. 42; Streatfield v. Streatfield, 1 White & Tudor's Leading Cases in

Equity, 524, and cases cited.]

The principle of election rests upon the equitable ground that no man can be permitted to claim inconsistent rights with regard to the same subject.   [Leading Cases, supra, note.]

In order, therefore, to deprive the widow of her homestead right, she must have accepted under the will of her deceased husband, property greater in amount than that to which she would otherwise have been entitled by law (Burgess v. Bowles, supra), or the intention to exclude these rights is manifest from the provisions of the will, otherwise she can claim both the benefits given her by the law and will.   Now, under the statute of descent and distribution, supra, the widow took nothing, and could only have done otherwise in the event of the death of some of the children without descendants living, for it is only in case that some of them should have thus died, that their portion descended under said statute to the mother, brother and sisters, and their descendants, in equal parts.   So that the widow was only entitled to dower under the dower act in the lands of her deceased husband, which, until it was assigned, entitled her to remain in and enjoy the mansion house of her husband, and the messuages or plantation thereto belonging without being liable to pay any rent for the same.   [Vol. 1, sec. 21, p. 542, Wagner's Statutes, 1872.]   It thus seems clear that she received nothing more under the will than she was entitled to receive by law had she not accepted its provisions, not only this, but there is not one word said in the will which would indicate an intention upon the part of the testator to exclude the right of his wife to homestead in the land upon which he resided at the time of his death, so that, the widow can, we think, claim both the benefits given her by the law and the will.   It follows that she was entitled to claim and hold, as her homestead, the one hundred and sixty acres of land in question, provided it did not exceed in value the sum of fifteen hundred dollars at the time of her husband's death in February, 1874, or even if it did, if by a binding and valid

agreement between herself and the heirs of her deceased husband it was set apart to her to have and to hold and occupy as such, regardless of its value, she could of course hold the entire tract. But she does not seem to have been a party to this agreement by express terms, although there was some evidence tending to show that she was, but the deeds to the respective parties were not signed by her but were made by the devisees by exchanging or making deeds to each other, and in pursuance of the will of the testator directing that his lands be divided among his children as they became of age. No reference was made in any of the deeds to the land in question, nor did the devisees, according to the weight of the evidence, release their interest, if any they had, in it.

The trial court found that the one hundred and sixty acres of land claimed by the widow as a homestead was at the time of her husband's death, in February, 1874, of the value of $2,000, which was $500 in excess of the amount fixed by law for such homestead. The fact that the land has been conveyed by the widow to one of the defendants, and he a part thereof to still another, does not affect the rights of plaintiffs, as the grantees were not innocent purchasers. Under the evidence, plaintiffs are not estopped by the partition of the other lands among the heirs of the testator from claiming an interest in the land in question subject to the widow's homestead rights.

As the widow never relinquished her right of dower in the lands of which her husband died seized, she is entitled thereto unless her interest in the homestead shall equal or exceed one-third interest therein for and during her natural life, in which event she is not entitled to dower in addition to homestead. [Sec. 5440, Revised Statutes 1899; Bryan v. Rhoades, 96 Mo. 485; Graves v. Cochran, 68 Mo. 76.]

The judgment will be reversed and the cause remanded in order that proper steps may be taken to set apart the widow's homestead, and to be otherwise proceeded with in accordance with this opinion. All concur.